Case number 21-1166, Independent Power Producers of New York, Inc. Petitioner v. Federal Energy Regulatory Commission. Mr. Hughes for the petitioner, Mr. Ettinger for the respondent. Good morning, Your Honor, and may it please the Court, Paul Hughes for Petitioner Independent Power Producers of New York. This case reduces to a straightforward question. As part of its rate-making, every four years, the New York independent system operator has to make a predictive judgment as to the anticipated economic life of a new power plant that would be built to meet increased demand. The issue here is whether the system operator reasonably exercise its judgment to use a 17-year amortization period. In rejecting the system operator's proposed rate, FERC erred twice. First, FERC answered the wrong question. The issue should have been whether the system operator's choice was a reasonable one. Instead, FERC views its task as weighing two competing options and choosing the one it preferred. That mistakes FERC's role in a Section 205 proceeding. Second, the system operator's choice was... Are you talking about the commission decision itself or it's brief here? I think it's the commission decision itself, Your Honor, but it's brief, I think, elaborates and makes clear what the commission did. Where in the commission decision itself do you see them saying, we just balance these things and pick whichever one we like best? Well, Your Honor, in the commission's decision, there's no finding that the proposal that was selected or advanced in the proposed rate filing by the system operator was unjust and unreasonable. I know that those words aren't there. I'm just asking where you think that they... I'm looking for the signal of the mode of analysis that you referenced. I understand what you're referring to from their brief. I just want to understand where you think they were similarly, apart from not having used those particular words in their determination, where you think they were misapprehended? Where you can find evidence in their decision they misapprehended their role? In paragraph 161, Your Honor, I think the mode of analysis that FERC offers here is that it considers essentially from first principles what it is that it believes the appropriate result should be applying. Well, it begins by saying NYISO has failed to demonstrate that this proposal is consistent with its services tariff requirement. That's exactly what it's supposed to do, right? You don't dispute that that's the type of analysis. Your Honor, I think what's missing from here is any determination as to what the scope of reasonable rate making would be, and then any explanation as to why what was selected by the system operator was unreasonable against the backdrop. I think the closest that FERC gets is in paragraph 161, where it suggests that a rate as selected with 17 years could quote unquote be unnecessarily high. But I don't think that their suggestion that this rate could be unnecessarily high is the same as a finding that it is an unjust and unreasonable. What about, do you have a similar argument with respect to the statement that they failed to demonstrate the NYISO, who does have the burden of proof? Here to demonstrate just and reasonableness. Failed to demonstrate that this proposal is consistent with the services tariff requirement to assess cost of facilities, power facilities. Yes, Your Honor, and I think exactly from what you're saying. That's distinct from the may result in high cost. That's a distinct explanation for what NYISO failed to do. Well, Your Honor, I think what FERC understands that to be is an argument that it's a suggestion that the system operator didn't meet its burden of demonstrating. And I don't think that analysis gets FERC where it needs to be for this reason. I agree that if there were a situation where a utility just offered a rate without any reasoned analysis underlying it as to the basis for how it arrived at that rate termination and submitted it with, again, no analysis, the commission would be justified in those circumstances and saying, because there was no explanation behind it, there was a failure to meet a burden. And in that gap, the sort of balancing and weighing exercise that FERC describes in its brief would be appropriate. But that's not what occurred in this case. At joint appendix pages 51 to 54, there are pages of analysis that incorporates other underlying reports and analysis, all of which that show that the system operator engaged in reasonable analysis. So I don't think it's a situation which you can say they failed to meet their burden of demonstrating the reasoning behind the reasonableness finding. And I think there's a very important legal and policy argument as to why FERC cannot so lightly find that there was a failure to meet a burden and substitute its judgment. And this is a point of agreement that we have with FERC. So at joint appendix page 1110, note 203, FERC cites and quotes the city of Bethany case for the underlying governing framework here. And this is what FERC says in that footnote, quote, the commission's authority under section 205 of the Federal Power Act is, and then citing this court's precedent, quote, limited to an inquiry into whether the rates proposed by utility are reasonable and not to extend to determining whether a proposed rate is more or less reasonable than alternative rate designs. Now, if FERC could just add sort of proformal language saying that there was a failure to meet a burden, and then that was a basis by which FERC could then substitute its judgment and engage in the balancing and weighing exercise it describes in its brief, that would really negate the flexibility that section 205 provides to the utility to make a reasoned determination of an appropriate rate within the range of reasonableness. So to step back for a moment, and I hope to answer the court's question, I think it's appropriate for FERC to engage in the sort of weighing and balancing exercise that is described and undertook here if it does one of two things. If it makes a clear finding that what the utility has done is unreasonable, we don't think that they've done that here. Or second, if they were to find that the utility has failed to give any reasoned explanation, there would be potentially a gap for the commission to fill. But neither of those things happened here. Instead, the commission went straight into weighing what it viewed as the 17 and the 20 year, and then making based on its own separate predictive judgment what it thought the appropriate rate structure would be. So we think that on that ground alone is a basis for this court to set aside what FERC has done. But I'd be happy to move to our second argument, which is even setting aside that failure and process of the commission, I think just substantively what the commission did here is not supportable. And that's because the system operators exercise of its predictive judgment was eminently reasonable in this case. And where I begin with is the reason it's reasonable is how the text of the Climate Act works, its text, the manifest legislative history behind it, and as well as how it's been interpreted by agencies in New York State subsequently. Now, I recognize FERC has offered what I view as two counterarguments that I'd like to talk about. The one is the view that the target date may at some point be modified. And the second, the assertion that there could be some sort of alternative fuels that could be switched such that power units that are built could switch to alternative fuels. So I certainly would like to get to FERC's two counterarguments. But to set the table first is the Climate Act has a manifest intent and purpose. And that is that there will be no fossil fuel generated power beginning in 2040. The text, this is section 66 P2, I think is quite clear in establishing this mandate. And that says the Public Service Commission, quote unquote, shall establish a program to require that by the year 2040, the statewide electrical system will be zero emissions. And at the time the Climate Act was enacted, it was universally agreed upon that the purpose of this law, the reason the legislature enacted it, the governor proposed it was in order to eliminate fossil generated electricity beginning in 2040. We've pointed to the governor's memorandum that summarizes the purpose and intent behind this bill, the remarks the governor made at the time of signing, all of the legislative history is in accord with it. That's the purpose of this act. And further, that's how a New York agency has continued to interpret the act since it was enacted. So as we pointed in our brief, the New York Department of Environmental Conservation has denied multiple permits, one to a story, another dance camera on the view, and they say, quote unquote, the statutory requirement that all electricity in the state be emission free by 2040. That is how the New York Department of Environmental Conservation understands and presently applies the statute. So that's the basis on which the system operator determined that there would be no natural gas generation for electricity beginning in 2040. And that was reasonable determination, in our view, in the proposed rate. Even I mean, here, even if folks reasoning and rejecting the 17 year amortization period isn't maybe a model of clarity, isn't there enough in the record to support its decision? I mean, couldn't for provide its expertise to conclude that it was very unlikely that gas fuel power plants would need to continue to be an effective 2040 because of reliability issues, which the Climate Act specifically recognizes? So thank you, Your Honor, I think the answer is no, that was not something that was within FERC's ability to do. And the background legal principle, again, that FERC agrees with here is when the agency has to make a predictive judgment about what is going to occur in the future. And part of that predictive judgment is what the state of the there's a recognition that what the law is going to look like in 2040 is something that is nobody can can predict with certainty. And so FERC has established a framework to assess that in order to minimize speculation in the current day. And that framework is they agree and they point to a New York operator case in 2017. What they say is you apply the existing affirmative mandates and you do not guess whether quote unquote, regulators will act at some point in future. I know, but this is a case, I'm sorry, tell me if I'm interrupting you, Judge Rao, but this is a case where the statute itself says more is yet to come, that these regulations have to be issued by the commission and that there's sort of, you know, protections in case, you know, this looks like it's not going to work. And so we're going to need, we may need to adjust things as we go along if it's not going to, you know, we got to make sure whatever we do that we're providing safe, reliable power. So the current state of this law has embedded in it these contingencies and you have, am I right, the commission opposed your position in this case, the one that's supposed to issue those regulations. You can correct my little fact, if I'm wrong on that, regardless, the statute itself has it embedded in there that yet, you know, more is yet to be determined and things, you know, may, there's a chance things may shift, then why aren't we in the land that Judge Rao was referring to where first predictive judgment is appropriate. So a few things, and you know, I would like to come back to what the public service commission said in this proceeding, because the basis that they opposed was on fuel switching, not that there would be a change in target. And I think that is an important distinction. I'd like to explain the problems with fuel switching, but that's a bit of a sideline. So let me come back to that in a moment, if I may, to answer your question directly is what FERC law requires of the system operator. And this is what the system operator said at joint appendix 52 is we apply the law as it is currently what it currently mandates, recognizing that there are always future acts in any statute, any statute can be repealed by the legislature modified by the legislature. And, and often there can be changes or exceptions that are later granted. The court is quite right to say that there is a recognition that future acts could be taken, but the distinction that FERC law draws that FERC endorses in this case, but just was improperly applied as this, the question is what is the affirmative obligation as we stand here today, we don't guess at what affirmative actions could, we could hypothesize might happen in the future, but we don't know. Sure. But just to be clear about what I'm asking, this, this doesn't feel like, well, maybe next year's legislator will repeal the law. This doesn't feel like that type of speculation at all, or who knows what a legislature 10 years from now, do they might throw the whole thing out? That's not what was going on here. They, they, the best defense of their decision and speaking for years, they pick up the statute and they go, the statute itself says the path forward is yet to be determined with any detail. And we have this goal in 2040, but we have this simultaneous goal of whatever you do, reliability of power must be preserved. And so we have two goals that could themselves be intention and a statute that itself says the path is yet to be determined. So we're not talking about who's going to repeal things in the future, whole new agencies coming in. We're looking at the current obligations under the statute. That feels different to me. Tell me why I'm wrong. Well, because you're the current obligation under the statute is to shut down by 2040. And let me explain that. I think first position is, is, is respectful of New York state law, because as I said, a moment ago, the legislature and the governor have plainly said that the purpose of developing this law is a shutoff of natural gas by 2040. And this is what in legally binding documents, the New York Department of Environmental Conservation is saying the state of the law is today. I quote again, this is at the Astoria decision at page 11, quote, unquote, the statutory requirement that all electricity in the state be emission free by 2040. That is the state of the law as a New York agency currently understands it and is making binding determinations as to its permitting process. Sorry, is that agency, but if it's not in the statute itself, the statute itself textually has more, at least could be read as having more less certainty. Well, the statute itself, are you saying that there's case precedent from FERC that it ignored that says, well, as long as you've got an agency, an expert agency talking about its you, you're bound. It's bound by that as well. The case precedent that we rely on, this is what FERC says, and this is in the New York independent system operator order from 2017 at paragraph 61 in FERC directs that we do not guess whether quote, unquote, regulators will act at some point in the future. And when we apply that to this statute here, they don't have to guess they have the statute is clear that regulators will act in the future. And what you're guessing about that, it's just, no, no, my apologies. Sorry. It's harder on Jim. Go ahead. Again, I apologize. We don't guess because 66 P2, your honor is written in mandatory terms. That is what we know is obligatory is the commission shall establish a program. And the result of that program will be a shutdown by 2040. Now the language in the statute that FERC prefers says that separately for the commission may at some point make a future finding to adjust that target date. That is the thing that we do not know is going to happen. The status quo as it exists today is the 2040 shutdown. And we know that because that's the one provision of the statutory tax that is affirmative and mandatory that creates the mandatory obligation. We know that because that's what the governor and the legislature said that they intended to do at the time they enacted this. And we know that because that is what the state agency who has to make decisions about clean air permits is understanding the law today to mean, and that is how it's getting applied. That doesn't rule out the possibility that the public service commission could take some future action to change that. But that's precisely where the FERC law comes in as we don't make guesses as to if, and what FERC speculation is, is that although the governor and the legislature and FERC's essential point is that at some point New York is going to realize that their target date of 2040 is a bad idea because it's going to lead to reliability problems. And they're going to retreat from what it is that New York has affirmatively said they're going to do. Our point is that's a guess. Maybe New York will effectuate the law as it currently exists and as the agencies are currently applying. And it's disrespectful of FERC to suggest that New York is not going to, in fact, be able to implement and apply the law as currently written. And we'll have to write an exception that's contrary to what the governor and the legislature said that they were doing in enacting this law. That's where the future speculation comes in. And that's where FERC precedent says in order to minimize the effect of speculation on these predictive judgments, we apply the affirmative mandatory obligations, which is the 2040. And we don't take into account the future act, which would be a moving of the target date by either the legislature or the commission. And I think that's the key distinction that we're making is between what is affirmatively required today versus what are actions that could be taken in the future that could move that, that right now we're guessing at based on reliability and other concerns FERC says might happen, but we just simply don't know. And the kind of wrap up of that point is what FERC has said in this law is to the extent that there's a change in the future, something that we don't know, but say there's a change of the 2040 date, there's a ready-made solution for that, which is the demand curve is reset every four years. So today, when we do the four-year demand curve, we use the affirmative obligations as they exist. If as FERC is speculating that there is some subsequent action taken by the commission that is an affirmative act that changes that, then in the next demand curve, that will be taken into account, but we don't guess today that what might happen someday down the road. Did you have something else you wanted to cover? I was just going to talk briefly about the alternative fuel, the fuel switching issue is the issue that the service, the public service commission mentioned. If I may, I know I'm over my time. Just do it in a minute, please. Thank you, your honor. There are really three problems and I'll touch on them briefly about fuel switching. All three in one minute. Yes, your honor. The first is the Chenery problem, the fuel switching argument was just not made below. The second, the idea that there would be fuel switching in 2040 to hydrogen or renewable natural gas simply doesn't work on this record because at J514, my client citing record evidence explained that this would be massively costly and would significantly increase the cost basis of the project requiring very different kind of substantial rebuttal. They didn't, so that's not an argument they can rely upon. And the third is this argument, I would just call it speculation on stilts. It's both legal speculation that there will even be fuel switching allowed that would require some affirmative act by the commission that's not yet happened. And second, it's technologically speculative because it's unclear that there's going to be grid level hydrogen or renewable natural gas that will be available. The historic decision says that page 12. All right. Thank you. We'll hear from FERC. Mr. Edinger.  So good morning and may it please the court. I'm Scott Edinger for the Federal Energy Regulatory Commission and thank you for hearing this case today. I'd like to go straight to the question of the procedural question about the just and reasonableness of the proposal to use the 17-year amortization period. And as we discussed in the brief, it is clear that the commission in this case, looking at paragraph 19 of the commission's order, it is clear that the is not just and reasonable. There are tons of myriad issues in this case that the commission accepted without discussing and it singled out this particular issue and it found all those issues to be just and reasonable as it said explicitly in paragraph 19. And then the commission explicitly singles out the amortization period and addresses it separately. I would that the only interpretation of that is that the commission found it to be unjust and unreasonable. In addition, the paragraph 161 that analyzes the amortization period found the 17-year period to be inconsistent with the tariff. And I would submit that that necessarily means that the I would like to, I would like to also address the, in the petitioner's brief in this case, what the commission, when I tried to explain what the commission did in this case, this court might get the wrong impression from what the record looked like from reading the petitioner's brief. There is no discussion of the market monitor's position. There's no discussion of the consumer stakeholder's position. There's no discussion of the New York commission's position in this case. What do they need to focus on other than the commission's decision? I'm sorry, your honor. That before us is the commission's decision. Absolutely. And the petitioners focused their challenge on the commission's decision. Correct. What's wrong with that is that it ignores the record evidence that the commission relied on here. What I'm trying to suggest, your honor, is that the record looks very different than what was suggested. And there is a record that involves comments from the market monitor, from the New York commission. That's what the commission relied on when it made the determination that the 17-year period is not just unreasonable. Let me just give you one example. The commission says, look, the state might suspend the zero emission requirement. That's one of the things FERC says. What in the record supports that? In paragraph 61, the commission explicitly relies on the comments of the market monitor. And for that, your honor, the comments are at the JA 954. And in addition, the comments of the market monitor relies on one comment. It relies... That the 17-year immobilization period fails to consider that the statute does not require power generators to retire. That's the only thing it references. That is correct. I would add to that, your honor, that the comments of the consumer stakeholders, which includes the New York commission here, explicitly stated that they supported the market monitor. Does FERC reference that? I mean, you're complaining that they haven't referenced that record information. Where did FERC reference that? The commission discussed the comments of the market monitor. Yeah, where did the commission... I get they've got... Not the comments. If there's another one relevant to the issue before us, to be clear. If there's another one, I read to you the one that they have. I don't see them referencing the views of the commission. Did I miss that on this issue? They don't explicitly, but they discuss the... They reference the comments in paragraph 157. This is at JA 1121. And there, the consumer stakeholders, which includes the New York commission, stated... That's just summarizing everybody's arguments. That's not them embracing it. That's not part... That's just... Right? That's just... That's not part of the commission determination. But that is the determination. In paragraph... No, actually, no. That's labeled arguments. And then there's on page JA 1123, commission determination. But what I mean... We're reviewing the commission determination. We're not fly specking how well it recorded or reiterated what other people were arguing. And it's in its determination. I just want to be crystal clear, unless I'm missing something. It doesn't reference the commission's view. It references one point made by the MMU, which is that the statute on its face does not require power generators to retire. Is there more that I'm missing where they expressly referenced these other arguments? I'm sorry, your honor. No, I said arguments rather than evidence. There are no other explicit references, but the entire pleading of the market monitor supports this point. And I would submit... It very well may, but the commission didn't embrace the entire pleading of the market monitor. It may not have explicitly, but the finding is... Where's your language that it's implicitly embraced the entire finding, as opposed to one finding that it, as MMU notes? The entire filing supports the proposition that the New York Act does not require the fossil fuel generation today to retire in 2040. And that is exactly what the commission finds in paragraph 161. I agree with that. And so I think respectfully, your honor, I don't think there's any other way to read that paragraph on what the commission is relying on. I would also... Where do they... If these fossil fuel resources that they reference are going to stay in operation after 2040, I think you explained in your brief that they would have to engage in retrofitting or other substantial technological changes, correct? That is one possibility, but that's not the only possibility. In the footnote, and footnote 255, the commission quotes the language of the New York Act, which there's a couple aspects of the act that I'd like to point out. First, the New York commission, which hasn't issued regulations yet. So I would agree with the point that the precedent relied on by the power producer simply doesn't apply here. And we're actually consistent with that precedent because we don't have a clear environmental measure at stake here that the commission should rely on. But what I was going to point out is that the language in that footnote both tells the New York commission that it must design the program, which it has yet to do, taking into account reliability concerns. And in addition, the further subsection of the act, subsection 4, talks about how modifications can be made by the New York commission. And that's what I was asking you about, right? So modifications at fossil fuel. Yes. Fossil fuel producers would have to undertake, right? And that is explicitly contemplated in the act. And then I assume modifications cost money? They do. Maybe a lot of money. It all seems like a lot of money to me, these numbers. It costs money, right? That's right. If that's what FERC was relying on, where do they factor those extra costs into determining? I mean, they wanted to take the existing, you guys have a long phrase for it, but I will just say the existing power plant measure that you're using to calculate the rate here, the localized, embedded, whatever all your words are on that. They just did that as an unmodified power plant. And they said, and they didn't disagree with that, but yet that can't be right. If they're right, that if what FERC is basing this decision on is the capacity, amortization has to reflect the capacity of these plants to make significant changes to their technology to be in compliance with the 20, and still be there in 2040. And they could still be there in 2040 if they make these significant changes, at least that's one option that FERC discerned. They would have to make these significant changes, but those significant changes would mean that the baseline that was used, the baseline plant cost that was used was all wrong too. And so FERC can't have it both ways. Well, I would submit, Your Honor. Where did it grapple with the costs, those increased costs and their effect on rates? And again, the paragraph 161 is in front of the court. It doesn't in that paragraph, but again, it's cited the market monitor and the market monitor discusses this. Oh, but again, I know you want the reference to the market monitor to be everything the market says, but I think they've said specifically what part of the market monitor they're relying on, that there's no required shutdown. Further, and now they're no longer talking about MMU, the statute recognized that requirements can be modified to allow them to remain in service. And that would include, as you argued in your brief, all these retrofitting, but the cost of all that has been never factored in by FERC. How could that be sensible? Well, I would respond to that, Your Honor, by saying that phenomenon is nothing new. And the consumer stakeholders point this out in their brief, that the idea, it is well-established, they say, that configurations will change. They say this at page 19 of their comments. This is at JA 753. We just don't know at this point and in the future. Well, if FERC based its position on the notion that fossil fuel operators can retrofit, modify in substantial ways that would keep them relevant after 2040, to determine that this rate was unjust and unreasonable, didn't it have to know how much it would cost for those plants to do that? It could well be that retrofitting would require an even higher rate than what it says may result from this immortization schedule. And again, Your Honor, I would suggest that that can be settled in the future. Usually when FERC says that will be settled in the future, it's because they refuse to engage in any speculation at the time. And that's the other side's argument, right? Look, right now, take it as it is. This is done on a regular, repeated basis. And if changes happen, then we'll factor it in. But that's not what FERC did. But again, Your Honor, the law doesn't require the retirements in the first instance. And if they are permitted, I'll point out as well, that if they are permitted to continue operation, as the market monitor suggested, to meet reliability... The law requires certain targets be met, correct? It does. It requires the commission... I'm sorry, I didn't mean to interrupt. It requires the commission to adopt a program to meet those requirements with reliability concerns in mind. But it still has to meet the zero emissions requirement. The commission doesn't have the authority to go, we don't like the zero emission requirement. It has to establish targets that will get there and satisfy reliability. I'm not sure I can agree with that, Your Honor. I know that the law requires the establishment of a program to meet the targets that Your Honor is referring to, but it is with the reliability concerns in mind. It's with reliability concerns in mind, right? And we've got evidence in this record. And again, the market monitor cited three studies suggesting that dispatch... But FERC didn't cite any of those studies. It did not, but it cited the market monitor and it fully supports the commission's finding that the law doesn't require these facilities to retire. Anything else? Okay, thank you. Mr. Hughes, you're out of time, but you can have a minute. Thank you, Your Honor. And I appreciate the court's indulgence, but I think the court well understands the issues. I wish not to repeat myself. So I'd be happy to answer any questions the court may have. Hearing none. Oops. No. Okay. Hearing none, the case is submitted. Thank you both.
judges: Tatel, Millett, Rao